2009 Ark. App. 180

**Carmal Renee DOWDY and Walter Dowdy, Appellants,**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
Appellee.

No. CA 08–1112.

Court of Appeals of Arkansas.

March 11, 2009.

Deborah R. Sallings, Ark. Pub. Defender Comm'n, Little Rock, for appellants.

Tabitha Baertels McNulty, Office of Chief Counsel, Little Rock, for appellee.

Chrestman Group, PLLC, by: Keith L. Chrestman, Jonesboro, attorney ad litem for appellee minor child.

COURTNEY HUDSON HENRY, Judge.

Appellants Carmal Renee Dowdy and Walter Dowdy appeal from the order of the Craighead County Circuit Court terminating their parental rights to their daughter, S.D., whose date of birth is December 15, 2006. For reversal, the Dowdys contend that the trial court's decision is not supported by the evidence, both as to the grounds for the termination and the court's findings regarding the best interest of the child. Based on the standard of review and the applicable law, we must affirm.

This case began on February 5, 2007, when appellee, the Department of Human Services (DHS), took emergency custody of S.D., who was almost two months old. DHS acted in response to a telephone call placed by Mr. Dowdy to the Child Abuse Hotline. The affidavit in support of the emergency petition indicated that S.D. was not being fed properly. Mrs. Dowdy would mix eight ounces of formula, feed the child half, and then properly discard the remainder. However, mixing too much formula ultimately caused the Dowdys to run out of formula, which prompted Mr. Dowdy to call the Child Abuse Hotline for assistance in the middle of the night. Mr. Dowdy was not able to understand Mrs. Dowdy's explanation that they had a voucher for formula that could have been used to resolve this problem. The affidavit also reported that the Dowdys disclosed that they had also run out of formula in January. As a result, they fed the child non-dairy coffee creamer mixed with water for a week. When DHS took S.D. for a physical examination, her stool was solid white, which the doctor attributed to her being fed coffee creamer. The court granted the petition for emergency custody and later found probable cause for the child's removal. On March 29, 2007, the trial court adjudicated S.D. dependent-neglected based on nutritional neglect.[1] The

---

1. The dissent states that there was no evidence to support the finding of dependency-

court set reunification as the goal of the case plan.

In the months that followed, DHS provided the Dowdys an array of services, including parenting classes, referrals, drug screens, transportation, home visits, homemaker services, and visitation that occurred in their home. Specifically, Mr. Dowdy received training provided by the Center for Fathers and Families, and Mrs. Dowdy engaged in intensive parenting classes offered by PACES.

The Dowdys also received psychological evaluations. The results of the evaluations showed that Mr. Dowdy and Mrs. Dowdy functioned with diminished mental capacity and that Mr. Dowdy's limitations were more pronounced than those of Mrs. Dowdy. For this reason, both received social-security disability benefits, which were their only source of income. Mr. Dowdy's evaluation reported a history of brain damage since birth. His test scores indicated significantly low intellectual development and serious deficits in social comprehension and verbal skills. Mr. Dowdy's profile reflected an individual who has difficulty with reasoning and who is prone to exploitation, confusion, and lapses in judgment. The evaluation report stated that Mr. Dowdy may have difficulty understanding spoken language and difficulty processing verbally-mediated information. With respect to Mrs. Dowdy, the evaluator wrote that she was notably simplistic with a tendency toward social naivety and that Mrs. Dowdy deferred to Mr. Dowdy on a number of issues. The report stated that indications of social and cultural deprivation, coupled with her low intellectual level, yielded substantial difficulties in safe parenting. The evaluator felt that, with favorable supports in place, Mrs. Dowdy might be able to effectively care for S.D.

The trial court held a permanency-planning hearing on January 15, 2008. The trial court found that DHS had made reasonable efforts to assist in reunification and that the Dowdys had complied with the case plan. Nevertheless, the court changed the goal of the case plan from reunification to the termination of parental rights. DHS filed a petition to terminate the Dowdys' parental rights on February 20, 2008.

At the termination hearing held on May 13, 2008, the trial court reviewed letters written by social-service professionals who had provided direct assistance to the Dowdys. The Executive Director of the Center for Fathers and Families informed the court that he recommended the termination of parental rights in light of "the tremendous safety issues and significant mental capacity challenges that I have observed." The director stated that Mr. Dowdy was eager to learn but that he had to repeat classes on the same subject and that it was as if Mr. Dowdy "didn't hear what we said the last time." The caseworker at PACES also advised against reunification at that time. For a year, the caseworker visited the Dowdys three or four times a month, and in her letter, she wrote that the Dowdys at times lacked the mental capacity to fully provide for the child. She reported that Mr. Dowdy sought help with Arkansas Rehabilitation Services in the hope of finding employment, but this organization deemed him mentally unable to obtain a job or to benefit from their services. The caseworker had discussed with the Dowdys ways to save money, but she had not seen any positive results from that effort.

neglect made in the adjudication order. Appellants sought no appeal from that order, thus this finding is no longer open to challenge. *Lewis v. Arkansas Dep't of Human Servs.*, 364 Ark. 243, 217 S.W.3d 788 (2005).

The trial court also admitted into evidence an evaluation status note from Mid–South Health Systems, Inc., concerning treatment Mr. Dowdy received there. The report noted that it was Mr. Dowdy's seventh admission since 1989, and it listed diagnoses of post-traumatic stress disorder, mood disorder with obsessive traits due to brain injury, and mild mental retardation.

The trial court also listened to the testimony of witnesses, including Sylvia Richards, who was the court appointed special advocate volunteer assigned to instruct the case. Ms. Richards identified the Dowdys' problems in feeding and dressing S.D. She alluded to the Dowdys' feeding the child coffee creamer. She also described how they changed S.D.'s clothes at the beginning and end of every visitation, which caused them difficulty because they would not unfasten the snaps on the child's clothing. Ms. Richards said that the Dowdys were polite and receptive to suggestions but that it was a constant struggle to instruct them because it was necessary to repeat the same suggestions every week. She testified that, over the course of time, the instructions that the Dowdys received one week might not apply the next, and she had concerns about their ability to adapt to changing circumstances. She also expressed concern about their ability to supervise a toddler in terms of being aware of potential dangers. She spoke of a time when the child crawled too closely to a television set that sat low and on an unstable base, and she said that Mr. Dowdy did not appreciate the potential for danger and did nothing to stop the child.

Ms. Richards testified that, as the child grew older, she perceived that the Dowdys would need immediate, substantial, and ongoing assistance if the child were to live in the home. She said that the ideal situation would be for the Dowdys to live in a duplex with someone next door and available to them twenty-four hours a day. She explored the possibility of having a relative or a member of the Dowdys' church provide twenty-four-hour-a-day assistance, but to no avail. Ms. Richards testified that DHS did everything in its power to help the Dowdys achieve reunification, and she knew of no additional services that could be offered to achieve that goal. She said that DHS had even suggested an assisted-living facility but that the Dowdys flatly rejected that recommendation.

Ms. Richards further testified that, with assistance, Mrs. Dowdy was better equipped to parent the child. She said, however, that Mr. Dowdy was so domineering and that Mrs. Dowdy was so subservient to him that she would go along with his decisions, even when she knew that he was wrong. Ms. Richards believed that Mr. Dowdy's dominance would prevent Mrs. Dowdy from being a suitable mother.

Ms. Richards also testified that Mr. Dowdy admitted to her that he was recently hospitalized because he accidentally took an overdose of his medication. She did not believe that the child would be safe in the Dowdys' care.

Brandi Lace, the DHS supervisor in the case from the beginning, testified that S.D. was in a serious situation at the time of removal because of the Dowdys' inability to feed her properly. Ms. Lace said that it was clear to her from the outset that the Dowdys displayed developmental deficiencies but that she awaited the results of the psychological evaluations to learn the depth of the problems. Ms. Lace stated that the Dowdys had completed every aspect of the case plan but that the services provided to them did not improve their ability to care for the child. She felt that the Dowdys' inadequacies were a product

of their psychological diagnoses and not due to a lack of education. Ms. Lace did not believe that the Dowdys possessed the mental capacity to care for a child and that the child would be at risk due to their limitations. She opined that, considering the problems the Dowdys had with meeting the basic needs of a small child, they would not be able to address her needs as she grows older.

Ms. Lace testified that her observations coincided with the traits noted in the psychological evaluations. She noted that Mr. Dowdy became frustrated easily and that he had difficulties communicating and understanding information relayed to him. She stated that Mr. Dowdy often felt it necessary to act as a liaison to convey information from others to Mrs. Dowdy and that the information he relayed would be incorrect. Ms. Lace also referred to Mr. Dowdy's hospitalization after he took an overdose of medication. She said that he mistakenly understood that the medication was to be taken one way, when in reality it was to be taken another way.

Ms. Lace had also observed obsessive behavior displayed by Mr. Dowdy. He made continual and repeated complaints over such things as a mark on the child's finger and his belief that the child's clothes were too tight. He also complained that S.D. smelled like smoke when no one else was able to detect that odor. Ms. Lace also described a "bizarre" situation when Mr. Dowdy insisted that the child's seatbelt was unfastened, although Ms. Lace knew that it was buckled. As a result, she stopped the car to make sure that he had not unfastened the belt just to prove his point.

Ms. Lace testified that Mr. Dowdy had a very dominant and outspoken personality, while Mrs. Dowdy was quiet and passive. She said that Mrs. Dowdy's capabilities were greater than Mr. Dowdy's but that his dominance in the relationship overshadowed her ability to parent the child. She had concerns about the Dowdys dispensing medication to S.D. if she became ill. Ms. Lace questioned whether Mrs. Dowdy would read the medication instructions correctly or, if she did, whether Mr. Dowdy might advise her differently and incorrectly. She based this concern on the fact that Mr. Dowdy had overdosed on his medication, although Mrs. Dowdy knew that he was not taking the correct dosage. Yet, Mrs. Dowdy acted as though she was the one who was confused about the proper dosage.

Ms. Lace also testified that the Dowdys would need assistance if S.D. lived with them and that it would not be sufficient for someone to simply check on them every two or three days. She noted that two members of the Dowdys' church had offered to be on call twenty-four hours a day. However, Ms. Lace did not trust the Dowdys to identify situations where they needed assistance and to request help from the church membership by placing a phone call. Ms. Lace also discussed the possibility of an assisted-living facility, but she said that appellants were inalterably opposed to the idea. Finally, Ms. Lace testified that S.D. was adoptable. She said that S.D. had been with the same foster parents since February 12, 2007, and that the foster parents wished to adopt her.

Mrs. Dowdy, age twenty-three, testified that she completed high school by taking resource classes and that she received disability for anxiety and depression. She said that she was adequately taking care of S.D. when the child was removed from the home. Mrs. Dowdy stated that, although she had wasted formula, S.D. never went without food. She understood that things did not come as easily to her as to others, but she said that she knew how to take

care of her child. She stated that there was never a real problem about their feeding of the child and that she had learned a lot from the classes she had taken. Mrs. Dowdy denied that Mr. Dowdy was domineering, but she said that he had his opinions and could be strong-willed.

Mrs. Dowdy stated that they lived in a two-bedroom apartment and that she cleaned the house and cooked. She said that their disability checks covered their expenses and that they had sufficient means to provide for S.D. Mrs. Dowdy testified that she did not want to live in an assisted-living facility because they were able to parent in their home and to provide for themselves. She felt that S.D. could return home without supervision.

Mr. Dowdy testified that he was thirty-four years old and that he graduated from high school in Jonesboro by taking resource classes. He recognized that he did not understand things easily but said that he worked hard to offset that shortcoming. Mr. Dowdy stated that he learned a lot in the classes he had taken and that his church family was willing to help them. He said that he was a "little bit" domineering but that he did not tell Mrs. Dowdy what to do. Mr. Dowdy said that he did not want to move into an assisted-living facility because he was the father and felt that it was his responsibility to protect the family.

The trial court ruled from the bench and granted the petition to terminate appellants' parental rights, after commenting that this was one of the most difficult cases the court had ever confronted. The court found that S.D. had been out of the home for more than twelve months and that the conditions which caused her removal had not been remedied by the Dowdys, despite the offer of appropriate services. The court also found that other factors had arisen since the filing of the petition that demonstrated that returning the child was not in her best interest. Specifically, the court found that the services DHS provided the family were extraordinary. Although the court was impressed by the Dowdys' love for their child and their willingness to comply with the case plan, the court determined that the Dowdys did not have the ability to fully digest and implement the skills that are necessary to care for a child. In this regard, the court found that the overriding concern in the case was incapacity rather than indifference. The court also found that termination was in S.D.'s best interest in that she was adoptable and that returning her to the Dowdys' care would expose her to a great risk of potential harm. The court entered its written order on July 10, 2008. This appeal followed, and the Dowdys contend that the trial court's findings regarding the best interest of S.D. and the grounds for termination are clearly erroneous.

■ Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Sowell v. Arkansas Dep't of Human Servs.*, 96 Ark.App. 325, 241 S.W.3d 767 (2006). Pursuant to Arkansas Code Annotated section 9–27–341(b)(3)(A)(i) and (ii) (Repl.2008), an order terminating parental rights must be based on a finding that termination is in the child's best interest, which includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parents. In addition, the proof must establish at least one of several statutory grounds. Ark.Code Ann. § 9–27–341(b)(3)(B). One of those grounds is that the juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the

parents for twelve months and, despite a meaningful effort by the department to rehabilitate the parents and correct the conditions that caused removal, those conditions have not been remedied by the parents. Ark.Code Ann. § 9–27–341(b)(3)(B)(ii)(*a*). Another ground is that other factors arose subsequent to the filing of the original petition for dependency-neglect which demonstrate that returning custody to the parents is contrary to the juvenile's health, safety, and welfare and that, despite an offer of appropriate services, the parents have manifested the incapacity or indifference to remedy the subsequent factors. Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(*a*). The facts warranting termination of parental rights must be proven by clear and convincing evidence. Ark.Code Ann. § 9–27–341(b)(3).

When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the trial court's finding is clearly erroneous. *Lewis v. Arkansas Dep't of Human Servs.*, 364 Ark. 243, 217 S.W.3d 788 (2005). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Yarborough v. Arkansas Dep't of Human Servs.*, 96 Ark.App. 247, 240 S.W.3d 626 (2006). We give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Lewis, supra.*

In contesting the trial court's finding that termination was in S.D.'s best interest, the Dowdys concede that the evidence supports a finding that S.D. is likely to be adopted, but they argue that the evidence is not sufficient to support a finding of potential harm should S.D. be returned to their custody. In making this argument,

they acknowledge Mr. Dowdy's difficulties, but they point out that the witnesses did not share the same concern as to Mrs. Dowdy. The Dowdys also contend that the evidence concerning potential harm is speculative because there is no way of knowing whether they will learn to properly care for the child.

According to Arkansas Code Annotated section 9–27–341(b)(3)(A), the trial court was only required to *consider* the potential harm to the health and safety of a child that might result from continued contact with the parents. *See McFarland v. Arkansas Dep't of Human Servs.*, 91 Ark.App. 323, 210 S.W.3d 143 (2005). The court was not required to find that actual harm would result or to affirmatively identify a potential harm. *Id.* Furthermore, the supreme court has directed that the potential-harm analysis be conducted in broad terms. *Bearden v. Arkansas Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001). Finally, the court's potential-harm inquiry is but one of the many factors that a court may consider in a best-interest analysis. *Id.*

The trial court in this case was required to assess the Dowdys' abilities as a parental unit, which included the influence of Mr. Dowdy. The testimony revealed that Mr. Dowdy was the decision-maker in the family and that Mrs. Dowdy yielded to Mr. Dowdy's judgment, which was shown to be seriously flawed. Mr. Dowdy's lapses in judgment included an overdose of his medication, which occurred even though Mrs. Dowdy knew the proper dosage. Together, they also fed the child coffee creamer instead of formula for an entire week. The evidence also showed that the Dowdys were not able to grasp or implement the lessons they had been taught, as it was continually necessary for those lessons to be repeated. The determination of potential harm is forward-look-

ing by its very nature, and in this instance the trial court correctly looked to past behavior as a predictor of potential harm that may likely result if the child were returned to the Dowdys' care and custody. We are not able to say that the trial court's best-interest determination is clearly erroneous.

In challenging the grounds for termination, the Dowdys do not dispute the trial court's finding that DHS provided meaningful and abundant services to them. They also recognize that they will always need assistance in caring for S.D. The Dowdys assert, however, that they fully cooperated with DHS and complied with every aspect of the case plan, and they argue that, given more time and additional services, they can continue to improve as parents.

In *Wright v. Arkansas Dep't of Human Servs.*, 83 Ark.App. 1, 115 S.W.3d 332 (2003), we observed that completion of the case plan is not determinative; rather, what matters is whether completing the requirements of the case plan achieved the intended result of making a parent capable of caring for the child. In the case of *Meriweather v. Arkansas Dep't of Human Servs.*, 98 Ark.App. 328, 255 S.W.3d 505 (2007), we recognized that parental inability or incapacity flowing from mental deficiency is among the statutory grounds for termination. We also rejected the mother's argument requesting additional time and services on the basis of the legislature's overriding intent to provide permanency in the life of a child. Our supreme court has also spoken on this issue in *J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997), where the court affirmed a termination decision when the mother was not capable of learning how to be a parent because of mental deficiencies and mental illness.

Here, the court adjudicated S.D. dependent-neglected based on nutritional neglect. However, this was but one aspect of a broader condition arising out of the Dowdys' mental deficiencies. From our review, the record supports the trial court's finding that the Dowdys lack the capacity to adapt to the ever-changing demands and challenges of raising a child. Ample evidence also exists to support a finding that the provision of further services will not alter this immutable fact. No witness doubted the Dowdys' love and devotion to their child. However, the Dowdys chose to reject the proposal for residing in an assisted-living facility, in spite of the fact that this was the only avenue by which they could achieve reunification. Based on the record and the applicable law, we are not left with a definite and firm conviction that the trial court mistakenly found that the Dowdys had failed in over one year to remedy the circumstances that caused the removal of the child, despite the offer of meaningful services.

Only one ground is necessary to terminate parental rights. *Fields v. Arkansas Dep't of Human Servs.*, 104 Ark.App. 37, 289 S.W.3d 134 (2008). Therefore, we need not discuss the alternative ground found by the trial court as supporting termination.

Affirmed.

VAUGHT, C.J., ROBBINS, and GRUBER, JJ., agree.

GLADWIN and BAKER, JJ., dissent.

GLADWIN, J., dissenting.

The evidence in this case is insufficient to support the trial court's order terminating appellants' parental rights; therefore, I dissent.

Appellants' two-month-old child S.D. was taken into custody after Mr. Dowdy

placed a call to the Child Abuse Hotline. Appellants ran out of formula and did not have money to purchase more. The affidavit stated that S.D. appeared to be healthy, was clean and appropriately dressed. The case worker stated that neither parent appeared to understand how to care for the baby. The affidavit stated that Dr. Matthews attributed S.D.'s white stool to being fed coffee creamer, but that she would have a normal stool within fifteen hours. The only thing Dr. Matthews said needed to be watched was a heart murmur. The affidavit alleged inadequate food, rather than inappropriate food, despite a complete lack of evidence that the child was ill or underweight. Based on this affidavit the trial court entered an order of emergency custody.

On March 29, 2007, the trial court entered an adjudication order finding that the Department exercised a 72–hour hold removing the child from immediate danger of severe maltreatment. The trial court specifically found the juvenile dependent-neglected due to nutritional neglect. The case goal was reunification with a concurrent plan of relative placement or adoption. Neither of the first two orders were appealed.

The Dowdys were provided with a number of services. The review order filed July 25, 2007, found that appellants had complied with the case plan, including completing psychological evaluations and following recommendations, completing parenting classes, working independently with other service providers, participating in visitation, and maintaining appropriate housing. Walter had continued working with the Center for Fathers and Families, and Mrs. Dowdy continued working with PACES. The trial court made no finding that appellants had failed in their obligation in any way. Despite appellants' compliance with the trial court's orders, a permanency planning order was filed on January 18, 2008, changing the goal to termination of parental rights.

The trial court reviewed the psychological evaluations for each of the appellants. The evaluations stated that Mrs. Dowdy was in the mild-intellectual-deficient range. Under impressions, the report states that Mrs. Dowdy "presents as free from psychopathological indicators, which would interfere with the care of her child." Despite evidence of social/cultural deprivation, along with a mental-retardation level of functioning on the full intellectual assessment, which indicates difficulties with safe parenting, the examiner felt that "with favorable supports in place Ms. [Dowdy] may be able to care effectively for her child."

Mr. Dowdy also was found to be in the mild-intellectual-deficient range. Further findings indicated he "may be construed as having significant difficulty in understanding basic needs of newborn infants." It further found "of significance is the fact that he may have difficulty 'understanding' spoken language and processing verbally mediated information." The recommendation was parenting skills with an emphasis on basics of child care.

At the termination hearing, the trial court reviewed a letter from Dr. Matthew Crain, Executive Director of the Center for Fathers and Families. He stated that he found the Dowdys to be very caring, loving parents who were devastated by their separation from their infant daughter. He stated that, like many new parents today, they are not prepared with all the skills they need but are eager to learn. Further Dr. Crain explained that appellants surrounded themselves with support from extended family, CASA, PACES, their church family, and Centers for Fathers and Families. He pointed out that they have endeavored to do whatever was

asked of them and appeared to make great strides. Dr. Crain makes the perplexing observation that Mr. Dowdy appears to be an excellent student; however in the same discussion, states that he has been required to repeat classes on the same subject. He further stated that, in light of significant mental capacity challenges he observed, his recommendation has changed to termination.

Qubelah Harden, case worker for PACES wrote in her report dated April 9, 2008, that she visited with appellants periodically. She further wrote that she outlined the basic services provided by PACES and discussed family finances with appellants. She wrote, "as for permanent placement of the child, I do not feel that right now she should be returned to the permanent custody of her parents. This is based *solely on the financial status of the parents* and how it affects their ability to care for her." (Emphasis added.) She added "please note that the parents truly love and adore their child and would move heaven and earth to care for her. Who is to truly say yes or no on whether they can or cannot care for their child adequately?"

Sylvia Richards, a court appointed special advocate (CASA) volunteer, testified at the termination hearing. She testified that she observed the following things that contributed to her recommendation that appellants' parental rights be terminated: a) S.D. was fed coffee creamer mixed with water; b) Renee changed S.D.'s diaper on her lap; c) Walter held S.D. too much; d) Walter allowed S.D. to crawl toward a television set that sat on a low and unstable stand; e) Renee suffered from sleep apnea; f) Walter accidentally took an overdose of his prescription medication; and g) Walter was the dominant person in the marriage. She testified, "Walter is a good person. It's just his thinking is impeded."

Brandi Lace, Craighead County Department of Human Services supervisor, testified that the department was recommending termination because S.D. is very young. She stated that Mr. Dowdy had issues with the department that he deemed major "that most people involved in the case don't see as major issues." Those issues included complaints about S.D.'s clothes, her smelling of smoke, and a concern as to whether S.D. was properly belted while riding in a car. Ms. Lace did not believe the Dowdys possessed the mental capacity to care for the child and that the child could be at risk due to appellants' mental deficiencies. She repeated the concern over Mr. Dowdy's dominate personality and appellants' resistance to move into an assisted-care-residential situation. She further found fault with appellants' inability to come up with an alternate plan to assisted living.

The majority opinion adequately sets out the Dowdys' testimony.

The trial court's order of termination found that S.D. had been out of the home for more than twelve months and that the parents lack the capacity to care for the child due to their mental deficiencies. The trial court noted that Mr. Dowdy had previously overdosed on his own medication due to a lack of understanding in how to take his medication, and this caused concern as to how he would give medication to the child.

Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Causer v. Arkansas Dep't of Human Servs.*, 93 Ark. App. 483, 220 S.W.3d 270 (2005). It is not a challenge to find a case stating that "a parent's interests in the nurture, upbringing, companionship, care and custody of children is generally protected by the Due Process Clause of the Fourteenth Amendment." *Troxel v. Granville*, 530 U.S. 57,

77, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (Souter, J., concurring) (citing *Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); |20*Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)).

However, courts are not to enforce parental rights to the detriment or destruction of the health and well-being of a child. *Causer, supra.* A heavy burden is placed upon a party seeking to terminate the parental relationship, and the facts warranting termination must be proven by clear and convincing evidence. *Id.* Clear and convincing evidence is that degree of proof which will produce in the fact finder a firm conviction regarding the allegation sought to be established. *Id.* This court recently stated in *Strickland v. Arkansas Department of Human Services*, 103 Ark. App. 193, 287 S.W.3d 633 (2008), that this standard of proof reduces the possibility that a parent's rights are terminated based solely on a few isolated instances of unusual conduct or idiosyncratic behavior and impresses the fact-finder with the importance of the decision, thereby perhaps reducing the chances that inappropriate terminations will be ordered.

The trial court clearly erred in finding that S.D. was dependent neglected and in terminating appellants' parental rights. Initially, the trial court erred in finding that S.D. suffered from nutritional neglect.

There is no evidence in the record that S.D. was ill, underweight, or in anyway neglected. The sole evidence relating to nutrition of the child was the color of her stool, and the affidavit stated that this would resolve in fifteen hours. At most, feeding S.D. coffee creamer was inappropriate but not neglectful. I submit that the |21appellants' feeding of S.D. was no worse than parents who allow an overweight child to eat fast food.[2] There is simply no evidence that this child was harmed in any manner whatsoever.

The trial court focused on appellants' mental deficiencies in finding a lack of capacity to care for the child. However, the evidence shows that appellants knew they needed to care for S.D. The great irony in this finding is that had Mr. Dowdy not been concerned about S.D.'s feeding and had never called the hotline, this case would likely not be before us. Furthermore, Brandi Lace testified that Mr. Dowdy's concern for S.D. was more than what she considered normal. It cannot be said that appellants do not have the capacity to understand S.D.'s needs on one hand, yet are overly protective on the other.

The trial court found that Mr. Dowdy's one-time-accidental overdose was caused by a lack of understanding of taking his medications; however, there is no testimony as to the circumstances surrounding this episode. The trial court's concern that this might result in harm to S.D. is logically flawed. The syllogism that Walter had an accident, therefore S.D. will have an accident does not follow. If it does follow logically, then all parents who have accidents may cause their children harm, thus their parental rights would be at risk.

The majority cites *Meriweather v. Arkansas Department of Human Services*,

---

**2.** See Center for Science and Public Interest, Fast Food Study, Aug. 4, 2008.

98 Ark.App. 328, 255 S.W.3d 505 (2007), and *J.T. v. Arkansas Department of Human Services*, 329 Ark. 243, 947 S.W.2d 761 (1997), to support the position that a parent's mental deficiency is among the statutory grounds for termination. These cases are easily distinguished from the present case. In *Meriweather, supra,* the child suffered broken bones, and the mother did not even acknowledge the injury. Further, the appellant showed her lack of interest by sleeping during visitation and failing to completely comply with the case plan. In *J.T., supra,* the child was also physically abused, and the parent suffered from mental illness. In the present case, the Dowdys were fully involved with S.D. and complied with the case plan.

The witnesses focused on appellants' refusing to consider assisted living. It is apparent that although low functioning, the Dowdys worked hard to maintain their independence. There is simply no basis other than speculation that would require them to enter assisted living.

Today the law is clear that in Arkansas some people are just not smart enough to be parents. As there was no actual harm to S.D., the majority focuses on potential harm. I suggest one other scenario of potential harm. In her early teens, S.D. asks her adoptive parents:

S.D. Did my parents hurt or neglect me?

PARENT: No, you were healthy, clean, and appropriately dressed when you were taken.

S.D. Did they not love me?

PARENT: No, they loved you very much, they would have moved heaven and earth for you.

S.D. Did they not understand that they needed to take care of me?

PARENT: Yes, that is why your father called the hotline in the first place.

S.D. Then why did the State of Arkansas take me away?

I will not speculate about the potential harm to S.D. for the answer to the last question.

I dissent.

BAKER, J., joins.