
# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV–17–476

| | |
|---|---|
| | **Opinion Delivered** November 15, 2017 |
| KRISTINA JOHNSTON<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT [NO. 43JV-16-17]<br><br>HONORABLE BARBARA ELMORE, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

Kristina Johnston appeals a permanency-planning-hearing order of the Lonoke County Circuit Court based on Ark. R. Civ. P. 54(b) and Ark. Sup. Ct. R. 6-9(a)(1)(B). This case presents a very close decision on the merits, but we are not left with a firm and definite conviction that a mistake was made. We therefore affirm the circuit court.

### I. *Overview*

This case[1] began in February 2016 when Johnston was arrested for fraudulent use of a credit card, and her children D.J., L.J., and B.M. did not have a caregiver. Johnston stipulated that her three children were dependent-neglected in March 2016 "due to her

---

[1] The record reflects that there was an open referral and a past protective-services case related to the children, but those are not contested in this appeal.

parental unfitness, specifically the mother had inadequate housing." She was ordered to cooperate with the Arkansas Department of Human Services (DHS), follow the case plan, not use controlled substances, submit to random drug screens, undergo a drug-and-alcohol assessment and follow its recommendations, successfully complete a drug-treatment program, and submit to a hair-follicle test. In April 2016, in addition to the previous orders, the circuit court ordered Johnston to complete parenting classes, individual counseling and family counseling (if recommended by the children's therapist), maintain stable housing and employment, submit to a forensic psychological evaluation, attend visitations, and demonstrate improved parenting.

Following a June 2016 review hearing, the court found that Johnston was in partial compliance but that she had "not proven stability. This must be done." Following an August 2016 review, the court wrote:

> The mother is in partial compliance. She has attended counseling weekly, completed her drug and alcohol assessment, psychological evaluation and parenting classes. She needs to follow the recommendations of both the drug and alcohol assessment and the psychological evaluation. A copy of her psychological evaluation shall be provided to her therapist. The mother does not have stable housing or employment at this time. These children need stability.

Notwithstanding the court's finding above, Johnston was ordered to participate in and complete parenting classes, individual counseling, family counseling (if recommended by the children's therapist), anger-management classes, random drug screens, remain drug free, complete drug-and-alcohol assessment (and follow any recommendations from it), attend outpatient drug treatment, attend AA/NA two times a week, maintain stable housing and employment, submit to a forensic evaluation, comply with the terms of case plan,

 

cooperate with DHS, maintain contact with DHS, attend visitation, and demonstrate improved parenting.

The circuit court reviewed the case again in November 2016, but it made no specific findings on Johnston's compliance with the court's previous order. In the November 2016 order, the court removed anger-management classes, family counseling, outpatient drug treatment, and AA/NA attendance from its requirements of Johnston.

The court conducted a hearing in March 2017 to determine a permanency plan for the children.

## II. *March 2017 Permanency-Planning-Hearing Testimony*

DHS caseworker Sharese Handie testified during the permanency-planning hearing that she had been assigned the case since September 2016, and that, from that time, Johnston had four different short-term living arrangements. Caseworker Handie said that she had visited the trailer home Johnston obtained in February 2017, approximately a month before the hearing, and that it was appropriate. According to Handie, DHS did not consider Johnston to have stable housing because she had the trailer only for a month. When asked if she knew whether Johnston had income "at this time," Handie answered, "She doesn't." Yet when asked if Johnston "had employment throughout the case," Handie replied, "She has."

Handie further testified that Johnston had completed her psychological evaluation in June 2016 and had followed up on the recommendations. Johnston also finished a drug-and-alcohol assessment and was referred to outpatient drug-and-alcohol treatment, which she completed. Johnston also completed parenting classes. She had been visiting the

children twice a week but had recently missed because of the flu.  Johnston had started a new round of counseling, but Handie didn't know the reason.  When asked to explain why Johnston had not made substantial measurable progress, she replied, "Because she just got another home, and that's unstable housing.  She still doesn't have a job."  According to Handie, those were the same issues that started the case.

Handie also testified that Johnston had just texted her that she had gotten married a few days before the permanency-planning hearing.  Handie had not had the opportunity to do a background check on the person Johnston had married, and that caused her concern.  Handie agreed that Johnston "has diligently worked towards reunifying with the children" but it would take Johnston another "six months to a year" to get stable enough for the children to return to her.

On cross-examination, Handie admitted that she did not know the name of Johnston's therapist but was aware that the target completion date for the therapy was 17 April 2017.  She also admitted several inaccuracies in her court report, including that it was inaccurate because it did not show that Johnston had completed outpatient therapy.  Handie maintained that Johnston did not have stable housing because she had just moved in.  She conceded that Johnston could complete her counseling and the three additional parenting classes the court ordered within three months.

DHS called Johnston as a witness.  Johnston testified that her husband is Chad Buckner and admitted that he is a felon. She said that they had permission from their probation officers to marry and that they chose to get married because they had been best friends for two years.  DHS asked Johnston many questions about her housing throughout

the case. The testimony is not entirely clear but it appears that Johnston was homeless for a while, that she lived in Sherwood for four months, that she lived in a place in Ward that had bed bugs, and that she has a trailer home at her current address in Cabot.

Johnston testified that she has babysitting jobs and sold things online stating, "I know that's not considered a job to the courts, I guess, but I have made plenty of money to support my family. And I have a savings account that I've saved up. . . . I've been saving every penny I've had while I was homeless." When asked about her new husband Chad, she said that he has a felony conviction for theft by receiving in 2014 and spent six months in jail. She also testified that she fraudulently used a credit card and got a $500 fine and a day of community service. There was also some questioning related to a misdemeanor terroristic-threatening charge, for which Johnston said she received one year probation and a large fine, which had been paid off and the probation "dismissed."

DHS then questioned Johnston about her health. She testified that she takes Cymbalta for depression, irritable bowel, and fibromyalgia. She also takes gabapentin, oxycodone, and tizanidine for pain and Klonopin for severe anxiety. She said that she does not take the medications when she needs to drive and that she has a husband who can drive.

She testified that she needs $1,440 a month to pay all bills and that she has an additional $1,060 leftover each month to use for the children. When asked about "being homeless for a lot of the case was not making it appropriately, correct?," she replied, "No, but I was trying to save enough money to be able to come up here and tell you I have money." She thought her children could come home "today" even though the children had been out of her care for over twelve months.

When DHS asked Johnston about "the grandmother" having custody of B.M., she expressed concern that all three of the grandmother's children had "been in trouble with the law," that the eldest daughter is a felon, and that B.M. told her during visitation that her "Nana and PaPa cussed in front of her and scream a lot." She expressed that "I would rather [B.M.] come home to me where she belongs and where she wants" but conceded that if the only choice were between B.M.'s grandmother or a stranger, she would choose the grandmother. As far as L.J., Johnston testified that she preferred a "Christian foster home" if given the choice between her current placement with an aunt and uncle and a stranger and that she wanted L.J. "out of that home." Related to D.J., she said that he had a "great Christian family" and that she wished there were more openings in that home.

On cross-examination by the attorney ad litem, Johnston stated that she had been charged with obstructing government operations and resisting arrest but that those charges had been dismissed. She also admitted to a felony theft-of-property conviction from 2014 (before this case started). She stated that she had switched primary-care providers because the judge wanted her to, that she was also being treated at Arkansas Pain Management, and that her disability application was pending.

On cross-examination by her counsel, Johnston testified about the six-month lease on the home where she currently resided. The lease was entered into evidence. She clarified that she had no pending criminal issues, that she had completed her outpatient treatment, and that she had completed one round of parenting classes and had three classes left on the second round of parenting classes. She testified about what she had learned from the parenting classes and that she had missed only one visit with her children because of a

bowel obstruction yet had made it to recent visits despite having the flu. She said that the counseling had been beneficial. On further cross- and recross examination it appeared that Johnston had seen many different therapists in the case.

Chad Buckner, Johnston's husband, testified that before the marriage he lived with his parents. He said that he had never been involved in a DHS case before, had no true findings on the child-maltreatment list, and had visitation with his son from a previous marriage. He testified that he was on probation for four years for theft by receiving but would complete probation in November. He said that Johnston would make $150 to $200 from selling things on Facebook and that she made more than him some days. When asked what would happen if she ran out of things to sell, he said that she had applied for disability and he has a friend who is a manager at Domino's Pizza. He said that he graduated high school with Johnston, that they had not seen each other for a long time, that they are best friends, and that he proposed about two weeks before they got married. Before that, he had a relationship with Johnston and her children and had provided money to Johnston. He denied illegal drug use except as a teenager and was willing to undergo a drug screen and a hair-follicle test.

Brett Collins testified for DHS. He said that all three children had been placed with him and his wife (Johnston's sister Lindsey) at the beginning of the case. He said that the children were doing "fairly well" but that there was a lot of resentment and discontent. In his view, D.J. was being deceitful by contacting his mom (Johnston), that things boiled over at a staffing, and he thought it best that D.J. move to a new home, which he did. Things with L.J. had been smoother once she realized that the Collinses were not "the monsters

that we were made out to be" but that B.M. still has "outbursts." Collins thought B.M. might do better in a home where she had more one-on-one attention and that she was attached to her grandmother. He said that he and his wife preferred to adopt L.J.

D.J.'s foster parent, Laura Patterson, testified that he had lived in her home since 5 August 2016. She said that D.J. had been doing very well and that he was welcome to stay with her and her husband for as long as needed. According to Patterson, D.J. works, is a straight-A student, and "gets along with everyone."

Judy Brannen, five-year-old B.M.'s paternal grandmother, testified that she had been visiting B.M. two hours a week every Sunday but wanted more visitation time. She agreed that her son, Jesse, could not be paroled to her house if B.M. were to stay there, that she could follow court orders, and that she would prefer a neutral third party meet Johnston should visitation be ordered.

D.J. testified that he is seventeen and that he would like to go back to his mother even though he has had a good time with the Pattersons and they have taken good care of him. He said that he is supportive of his mother's marriage to Chad, that Chad is a "great guy," that he provides money, and that "not too many men hop into a relationship with three kids." He testified that he had been waiting over a year to get the "driver's reimbursement" from DHS and that he didn't understand "why we can't go back to our mother." On cross-examination, he said that family counseling would be beneficial.

The attorney ad litem testified that she had spoken to L.J., and that L.J. did not want to testify but she wanted the court to know that she wanted to remain in her current placement with her aunt and uncle. A CASA report was also entered into evidence.

Jennifer McCain, a licensed master social worker at Centers for Youth and Families, testified Johnston was transferred to her as a client from a fellow coworker on leave from a medical issue. She testified that she had been to Johnston's home and that there was nothing that had caused her concern. In the two sessions she had with Johnston, McCain thought that she had been forthcoming, open, honest, and compliant. She explained that the program was a short-term twelve-week program with a maximum of sixteen weeks, and that April 17 would be Johnston's twelfth week in the program.

Following the hearing, the circuit court determined that reunification with Johnston was not in the children's best interest and that continuing DHS custody was necessary for the juveniles' health and safety. The permanency goal for the oldest child, D.J. (age 17), was "Another Planned Permanent Living Arrangement (APPLA)." For the middle child, L.J. (age 14), the goal was a subsidized permanent guardianship with relatives. For the youngest child, B.M. (age 5), the goal was permanent custody with her grandparents. The court found that DHS made reasonable efforts to finalize a permanency plan by providing foster care, drug-and-alcohol assessments, individual counseling, inpatient drug treatment, parenting, psychological evaluations, home visits, supervised parent-child visits, and hair-follicle tests. Importantly, the court found that Johnston had not made "significant measurable progress." It ordered DHS to make a referral for family counseling with D.J. and B.M. and relieved the department from providing any further services to Johnston other than counseling.

III. *Arguments on Appeal*

Here, Johnston argues that the circuit court clearly erred when it refused to afford her three additional months to achieve reunification pursuant to Ark. Code Ann. § 9-7-338(c) (Repl. 2015), and found that the respective goal changes for the three children were in their best interest. DHS responds that "Johnston failed to preserve at trial and abandons on appeal any argument that the circuit court should have found all the elements required to allow the circuit court to continue the case plan goal of reunification." It further argues that the circuit court did not clearly err in changing the goals in the case, and the evidence supported the conclusion that it would not be in the juveniles' best interest to return to Johnston's custody. The children, through their attorney ad litem, maintain that Johnston failed to prove by a preponderance of the evidence that she made significant measurable progress and that the circuit court chose a permanency plan that was most preferred under the juvenile code.

A. Preservation

We begin with DHS's contention that Johnston's arguments are not preserved for review. The general rule is this: in a civil bench trial, a party may challenge the sufficiency of the evidence for the first time on appeal. *Bohannon v. Robinson*, 2014 Ark. 458, at 5, 447 S.W.3d 585, 588. In *Gyalog v. Arkansas Department of Human Services*, we held that a notice of appeal that designated a permanency-planning order was sufficient to preserve a challenge to the permanency-planning order. 2015 Ark. App. 302, at 8, 461 S.W.3d 734, 739. Gyalog argued that the court's decision to change the case goal from reunification to termination and adoption was clearly erroneous, and we characterized that argument as a

sufficiency challenge to the permanency-planning order. *Id*. Like Gyalog, Johnston has appealed the court's permanency-planning decision and is arguing that there was insufficient evidence to meet the statutory requirements to change the case-plan goal. She may therefore make her sufficiency challenges to the permanency-planning decision for the first time on appeal.

### B. Merits

Turning to the merits of Johnston's sufficiency-based arguments, we review findings in dependency-neglect proceedings de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous. *Lamontagne v. Ark. Dep't of Human Servs.*, 2010 Ark. 190, 366 S.W.3d 351. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Id*. This court defers to the circuit court's evaluation of the credibility of witnesses. *Id*.

The statute in place at the time of the permanency-planning hearing provides,

> (c) At the permanency planning hearing, based upon the facts of the case, the circuit court shall enter one (1) of the following permanency goals, listed in order of preference, in accordance with the best interest, health, and safety of the juvenile:
> (1) Placing custody of the juvenile with a fit parent at the permanency planning hearing;
> (2) Returning the juvenile to the guardian or custodian from whom the juvenile was initially removed at the permanency planning hearing;
> (3) Authorizing a plan to place custody of the juvenile with a parent, guardian, or custodian only if the court finds that:
> (A)(i) The parent, guardian, or custodian is complying with the established case plan and orders of the court, making significant measurable progress toward achieving the goals established in the case plan and diligently working toward reunification or placement in the home of the parent, guardian, or custodian.

(ii) A parent's, guardian's, or custodian's resumption of contact or overtures toward participating in the case plan or following the orders of the court in the months or weeks immediately preceding the permanency planning hearing are insufficient grounds for authorizing a plan to return or be placed in the home as the permanency plan.

(iii) The burden is on the parent, guardian, or custodian to demonstrate genuine, sustainable investment in completing the requirements of the case plan and following the orders of the court in order to authorize a plan to return or be placed in the home as the permanency goal; and

(B)(i) The parent, guardian, or custodian is making significant and measurable progress toward remedying the conditions that:

(a) Caused the juvenile's removal and the juvenile's continued removal from the home; or

(b) Prohibit placement of the juvenile in the home of a parent.

(ii) Placement of the juvenile in the home of the parent, guardian, or custodian shall occur within a time frame consistent with the juvenile's developmental needs but no later than three (3) months from the date of the permanency planning hearing;

(4) Authorizing a plan for adoption with the department's filing a petition for termination of parental rights unless:

(A) The juvenile is being cared for by a relative and the court finds that:

(i) Either:

(a) The relative has made a long-term commitment to the child and the relative is willing to pursue guardianship or permanent custody; or

(b) The juvenile is being cared for by his or her minor parent who is in foster care; and

(ii) Termination of parental rights is not in the best interest of the juvenile;

(B) The department has documented in the case plan a compelling reason why filing such a petition is not in the best interest of the juvenile and the court approves the compelling reason as documented in the case plan; or

(C)(i) The department has not provided to the family of the juvenile, consistent with the time period in the case plan, such services as the department deemed necessary for the safe return of the juvenile to the juvenile's home if reunification services were required to be made to the family.

(ii) If the department has failed to provide services as outlined in the case plan, the court shall schedule another permanency planning hearing for no later than six (6) months;

(5) Authorizing a plan to obtain a guardian for the juvenile;

(6) Authorizing a plan to obtain a permanent custodian, including permanent custody with a fit and willing relative; or



(7)(A) Authorizing a plan for another planned permanent living arrangement that includes a permanent planned living arrangement and addresses the quality of services, including, but not limited to, independent living services and a plan for the supervision and nurturing the juvenile will receive.

(B) Another planned permanent living arrangement shall be selected only if:

(i) The department has documented to the circuit court a compelling reason for determining that it would not be in the best interest of the child to follow one (1) of the permanency plans identified in subdivisions (c)(1)-(6) of this section and this subdivision (c)(7);

(ii) The child is sixteen (16) years of age or older; and

(iii) The court makes a judicial determination explaining why, as of the date of the hearing, another planned permanent living arrangement is the best permanency plan for the juvenile and the court finds compelling reasons why it continues to not be in the best interest of the juvenile to:

(a) Return home;

(b) Be placed for adoption;

(c) Be placed with a legal guardian; or

(d) Be placed with a fit and willing relative.

(d) At the permanency planning hearing on a juvenile sixteen (16) years of age or older, the court shall ask the juvenile his or her desired permanency outcome, or the attorney ad litem shall enter evidence concerning the child's wishes.

(e) At every permanency planning hearing the court shall make a finding on whether the department has made reasonable efforts and shall describe the efforts to finalize a permanency plan for the juvenile.

(f) A written order shall be filed by the court or by a party or party's attorney as designated by the court and distributed to the parties within thirty (30) days of the date of the hearing or prior to the next hearing, whichever is sooner.

(g) If the court determines that the permanency goal is adoption, the department shall file the petition to terminate parental rights within thirty (30) days from the date of the permanency planning hearing that establishes adoption as the permanency goal.

Ark. Code Ann. § 9-27-338.

Pursuant to the statute, the preferred goal is for the circuit court to authorize a plan

to place the children back with Johnston if she can show that she is complying with the

established case plan and court orders, making significant measurable progress, and the children can be returned within three months. Ark. Code Ann. § 9-27-338(c)(3)(A)−(B).

Johnston asserts that the circuit court erred in finding that she had failed to make substantial, measurable progress. She further argues that placement pursuant to section 9-27-338(c)(2), which authorizes the circuit court to create a plan to return the juvenile to the parent within three months of the permanency-planning hearing, was in her children's best interest. In Johnston's view, the change of the case goal was not in her children's best interest because seventeen-year-old D.J. testified that he wanted to be with his mother and the court could have made reunification and APPLA concurrent goals without affecting D.J.'s permanency plans. A similar concurrent plan could be made with L.J. because the subsidized guardianship is lengthy and in the meantime, Johnston could be prepared to have custody of L.J. within three months. As to B.M., she was not even in her grandparents' custody at the permanency-planning hearing so it was contrary to her best interest to change the goal to permanent custody with the grandparents when Johnston was making meaningful progress and complying with the case plan. The bottom line to Johnston's argument is this: permanency for the children would not have been affected by giving her three additional months to achieve reunification, that is the preferential goal under the statute, and it is in the children's best interest.

DHS responds that it was reasonable for the court to conclude it was in the juveniles' best interest for the case goals to change because "Johnston remained unstable and did not sufficiently benefit from the services to allow reunification at the [permanency-planning hearing] or within three months." D.J. was going to age out of foster care soon. L.J. did

not want to return to Johnston, and B.M. has had frequent visits with her grandparents and was bonded to them. The attorney ad litem echoes DHS's arguments.

There are facts in the record that favor Johnston. She submitted to drug screens and completed outpatient substance-abuse treatment in November 2016. She attended visitation with her children. She finished a set of twelve parenting classes and then completed nine out of twelve of a second round of classes ordered by the court, and the caseworker testified that the remaining three classes would be completed within three months. Johnston completed a psychological evaluation and counseling and followed up on all recommendations, according to the DHS caseworker. Her therapist, Jennifer McCain, testified that Johnston had been compliant and forthcoming with her and had been open and honest about the diagnoses in her psychological evaluation. The caseworker testified that Johnston's completion of her counseling would occur within three months should the court grant that additional time.

We hold, however, that the circuit court neither clearly erred in changing the goals in this case nor in finding that Johnston failed to make "significant measurable progress." Johnston had more than one year to achieve stability and was repeatedly homeless for extended periods throughout the case and had bed bugs and other problems with appropriate housing. Her employment consisted of selling things on Facebook. The caseworker testified that the home could not be considered "stable" until Johnston had it for at least six months and that Johnston needed six more months or a year to become stable. She married a felon, Chad Buckner, a few days before the permanency-planning hearing and did not inform DHS of the marriage. The record shows that Johnston had multiple medical issues—

depression, anxiety, and pain—that require multiple medications impacting her ability to supervise the children if they were returned to her custody. She had yet to complete all of her counseling and parenting classes that the court had ordered. There was evidence that Johnston was unstable and did not sufficiently benefit from the services DHS provided even after one year of services. A parent's overtures toward participating in the case plan or following the orders of the court in the months or weeks immediately preceding the permanency-planning hearing are insufficient grounds for authorizing a plan to return or be placed in the home as the permanency plan. Ark. Code Ann. § 9-27-338(A)(ii).

The court also did not err in finding that reunification with Johnston was not in the children's best interest. Johnston did not maintain safe and appropriate housing throughout the case and was homeless much of the time. Even though she had leased a home a month before the permanency-planning hearing, the court could conclude that she was not likely to maintain that housing given her past behavior and history of moving frequently to housing that was temporary and often unsafe for juveniles. She also had a history of instability with various criminal charges, which was the reason the children were taken into care. The children were doing well in their placements, and the court could find a risk of harm should they be returned to Johnston's custody based on her past behavior. *See Bearden v. Ark. Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001) (potential-harm inquiry is one of the many factors that a court may consider in a best-interest analysis); *see also Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, at 12, 314 S.W.3d 722, 728 (circuit court not required to find that actual harm would result or to affirmatively identify a potential harm).


IV. *Conclusion*

After reviewing the entire record, we are not left with a definite and firm conviction that a mistake was committed.

Affirmed.

GLOVER and VAUGHT, JJ., agree.

*Lightle, Raney, Streit & Streit, LLP*, by: *Jonathan R. Streit*, for appellant.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.