Cite as 2021 Ark. App. 345

# ARKANSAS COURT OF APPEALS

DIVISION III

No. CV–21–95

RACHAEL ALEXANDER

APPELLANT

V.

ARKANSAS DEPARTMENT OF HUMAN
SERVICES AND MINOR CHILD

APPELLEES

Opinion Delivered SEPTEMBER 22, 2021

APPEAL FROM THE PULASKI
COUNTY CIRCUIT COURT,
ELEVENTH DIVISION
[NO. 60JV-19-331]

HONORABLE PATRICIA A. JAMES,
JUDGE

AFFIRMED

## ROBERT J. GLADWIN, Judge

Rachael Alexander appeals the December 2, 2020 order entered by the Pulaski
County Circuit Court terminating her parental rights to her minor child, M.C. She
challenges the sufficiency of the evidence to support both the statutory grounds and the trial
court's best-interest finding. We affirm.

## I. *Facts and Procedural History*

On June 11, 2018, the Arkansas Department of Human Services (DHS) received a
report of abuse, threat of harm, and inadequate supervision of M.C. That report was
substantiated, and a protective-services case was opened. Alexander was charged with four
counts of child endangerment, and DHS made a referral for parenting classes, a drug-and-
alcohol assessment, and home visits, which were provided to Alexander. Alexander failed
to complete her drug-and-alcohol assessment and stated that she did not need drug
treatment. DHS made two referrals for parenting classes; Alexander was discharged for

noncompliance on the first referral and completed two out of three modules of parenting classes under the second referral. In February 2019, DHS lost contact with Alexander.

On March 19, DHS exercised emergency custody of M.C. based on Alexander's inadequate supervision and environmental neglect. Specifically, the North Little Rock Police Department made contact with M.C., who was two years old at the time, when he was discovered outside in the street unsupervised. M.C. was transported to the hospital, where DHS took him into emergency custody.

On March 22, DHS filed a petition seeking ex parte emergency custody of M.C. alleging that M.C. was a dependent-neglected juvenile due to "environmental neglect, neglect, and parental unfitness[.]" On the same day the petition was filed, the trial court entered an ex parte order granting DHS emergency custody of M.C.

On March 25, the trial court held a probable-cause hearing and entered its order that same day. The parties stipulated that probable cause existed when the emergency hold was taken and continued to exist and that M.C. would remain in DHS's custody. Alexander informed the trial court that the maternal grandmother, Patricia Pitts, and maternal uncle, Ray Pitts, were interested in having M.C. placed in their care, and the trial court ordered home studies be completed on them. The trial court ordered Alexander to complete random drug screens; submit to a drug-and-alcohol assessment; and follow recommendations, attend parenting classes, and maintain stable housing and employment.

On May 13, an adjudication hearing was held. The trial court accepted the stipulation by the parties that M.C. was dependent-neglected because of inadequate supervision and neglect by Alexander. The trial court further found that Alexander was in partial compliance with the court's previous orders but that she was unemployed and had been living with a

2

friend until she could obtain a place of her own. Alexander had completed the psychological evaluation and had started counseling but had been terminated from counseling due to nonparticipation. The trial court noted that (1) on April 2, Alexander had tested positive for THC; (2) on May 7, the drug screen registered no temperature; and (3) on May 13, Alexander had tested negative. The order also reflected that Alexander had missed two visitations because she was "having issues" and because she forgot. The trial court set the goal of the case as reunification and relative placement or guardianship as the concurrent goal and found that DHS had made reasonable efforts to provide services to prevent removal and achieve the case's goals.

On September 4, a review hearing was held. The trial court again found that Alexander was in partial compliance with the court's previous orders and case plan and that DHS had made reasonable efforts to provide services to prevent removal and achieve the case's goals. Specifically, the trial court found that DHS had provided counseling, a drug-and-alcohol assessment, parenting classes, and a second referral for counseling because Alexander was noncompliant and had been dismissed by the counseling service.

Alexander had also been provided a bus pass for transportation. DHS stated it had offered Alexander other transportation options with appropriate notice, but Alexander had been unwilling to notify them within forty-eight hours that she needed transportation. Alexander testified that she did not catch the city bus or a cab during scheduled visits because it was hot or raining.

Alexander had several drug screens with the following reported results: (1) May 7— did not register a temp; (2) May 14—negative for all drugs; (3) May 21—negative for all drugs; (4) June 27—negative for all drugs; (5) July 8—refused to do a drug screen because

3

she did not think it was necessary. Evidence was presented that Alexander had not had a hair-follicle test performed, and the trial court ordered Alexander to take a hair-follicle test if DHS thought it necessary.

Evidence indicated that Alexander had been a "no-show, no-call" for one of the scheduled parenting classes. Alexander stated that she has a stable residence but said that she would not provide an address until she gets her lights back on. Although Alexander had been attending visitation, it was reported that she often left early because she "has things to do." The trial court further found that Alexander "consistently" worked the services "towards what is needed" and concluded it was time for more intensive therapy and classes focused on interacting with younger children. The goal of the case remained reunification with Alexander with a concurrent goal of relative placement or guardianship.

On May 4, 2020, a permanency-planning hearing was held. Alexander's hair-follicle test result was positive for THC. Rachel Crites, a counselor with Recovery Centers of Arkansas (RCA), testified that Alexander had been noncompliant with her outpatient drug treatment. LaSonya Morehead, a DHS caseworker, testified that (1) DHS had concerns with Alexander's decision making; (2) Alexander was still in partial compliance; and (3) Alexander needed to participate more in parent–child therapy. Ms. Morehead explained that DHS had concerns that Alexander was still using drugs and that she has not benefited from services. Ms. Morehead recommended the termination of parental rights (TPR) with respect to M.C. and asked that the goal be changed. In its order filed on May 11, the trial court found that DHS had made reasonable efforts to finalize a permanency plan for M.C. and that Alexander continued to be in partial compliance, and it concluded that her progress warranted an additional three months to work toward reunification. The goal of the case remained

4

reunification with Alexander, and the concurrent goal remained relative placement or guardianship.

Two months later, on July 10, DHS and the attorney ad litem jointly moved to expand Alexander's visitation to unsupervised with DHS having the discretion to begin weekend visitation. The motion stated that Alexander was still in partial compliance, had tested negative on all drug tests, and M.C.'s health and safety needs would be met with the safety plan in place. Alexander's first unsupervised visit occurred on July 16. At the visit, Alexander tested positive for THC and admitted having eaten a brownie containing THC. Additionally, she took M.C. in a Lyft to a barbershop and to her mother's home without prior DHS approval. On July 21, DHS and the ad litem jointly moved to modify visitation back to supervised, and on July 27, the trial court granted the motion and ordered visitation return to supervised.

On July 27, DHS and the ad litem filed a joint petition to terminate Alexander's rights, alleging that TPR was in M.C.'s best interest and supported by the following three statutory grounds: (1) failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2021)); (2) subsequent factors (Ark. Cod Ann. § 9-27-341(b)(3)(B)(vii)*(a)*); and (3) aggravated circumstances (Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)* (A)-(B)(i)).

On July 29, a fifteen-month permanency-planning hearing was held. The trial court found that DHS had made reasonable efforts to finalize a permanency plan for M.C. Although the trial court gave Alexander an additional ninety days to work services toward reunification, it noted that Alexander has not gained the skills to be reunified with M.C. and changed the case goal to TPR and adoption.

A TPR hearing was held on October 19. At the beginning of the hearing, DHS announced its intent to abandon the TPR petition but explained that the ad litem wished to go forward. The ad litem's first witness was Brenda Keith, an adoption specialist for DHS. Ms. Keith testified that she ran a data match for M.C. and found 194 families who indicated a willingness to "consider" children with characteristics similar to M.C. She testified that she did not believe there were any barriers to adoption for M.C., but she acknowledged on cross-examination that M.C. had seventeen placements during the course of the case, and that was not a characteristic that was considered when looking for potential matches in the system. Ms. Keith also noted that she was unaware that the previous caseworker had testified that M.C. is not adoptable.

Melissa Trotter, a DHS program assistant who supervised the visitation, testified that she was concerned with Alexander's interactions with M.C. during visitation. She explained that Alexander had not accepted "redirection well," used profanity, employed corporal punishment, slept, and engaged on video chat, Facebook, and Facetime during visits. Ms. Trotter did acknowledge that she also observed some good visits between M.C. and Alexander but stated that she did not believe M.C. would be safe if unsupervised visits were allowed. Ms. Trotter testified that she did not believe Alexander had improved her parenting skills during the case, but she acknowledged that she had not observed visitation since Alexander and M.C. began more intensive therapy and had no way of knowing the effectiveness or progress that occurred following that therapy.

The ad litem next called Dr. Sufna John, an expert in child clinical psychology, early-childhood mental health and trauma, and child-interaction therapy. Dr. John was M.C.'s therapist and provided interaction therapy for Alexander and M.C. She began providing

6

therapy for M.C. on May 13, specifically child-parent psychotherapy, but after conversations with the caseworker and conversations at the case staffings, Dr. John transitioned to parent-child interaction therapy on June 29. That therapy was designed to address disruptive behavior and assist children who have a "wide range of behavioral difficulties" and who have experienced trauma. Dr. John testified that Alexander had shown strong improvement in strengthening positive parenting practices and was reducing negative parenting practices. Dr. John stated that there was still a need to make more progress in general—particularly regarding the negative parenting practices—and clarified that she was seeing "slower progress" with Alexander in using skills without hands-on guidance.

Mr. Edward Wallace, the DHS family-services worker and supervisor, provided a procedural history of the case and testified regarding the services offered. He testified that Alexander had completed a psychological evaluation, a drug-and-alcohol assessment, and MYTE parenting classes and was actively participating in counseling. He acknowledged that DHS no longer recommended TPR and no longer believed adoption was the appropriate goal based on Alexander's compliance, improved visitation, and progress in the parent-child therapy. While Mr. Wallace stated that he did not believe M.C. could return home that day, his belief was not based on a concern regarding Alexander's ability to supervise M.C. He believed she needed to continue to build her parenting skills through the parent-child therapy and advance to the next phase of therapy. Mr. Wallace explained that DHS wanted to increase Alexander's visitation so it could occur in the home rather than the DHS office.

Alexander then offered the testimony of Patty Hibbs, a DHS county supervisor and supervisor of Mr. Wallace. She explained that DHS changed its recommendation from adoption back to reunification because the adoption recommendation was based on things

such as Alexander's profanity, smoking, and choices of snacks but that no one was able to detail any "actual" or "imminent" safety threats to M.C. She reiterated Mr. Wallace's testimony that DHS would like to increase M.C.'s interactions with Alexander through a therapeutic foster home closer to Pulaski County to facilitate additional visits. Ms. Hibbs stated that she did not have any safety concerns between M.C. and Alexander but acknowledged that Alexander could be seen as having an "overall gruffness" that others might find offensive. Ms. Hibbs testified that TPR was not in M.C.'s best interest because she believed M.C. and Alexander were bonded and that separating them would be detrimental to M.C.

The final witness at the TPR hearing was Ms. Chelsea Thompson, the court appointed special advocate assigned to the case. She testified that she had "lots" of interaction with M.C. and with Alexander during the case and agreed with DHS's decision to change its recommendation regarding TPR. She stated that she believed it was in M.C.'s best interest to be reunited with Alexander. Ms. Thompson testified that she had been to Alexander's home several times and never noted any safety concerns and believed it was appropriate. Ms. Thompson had also discussed with Alexander her plan to gain employment. Ms. Thomson testified that Alexander's hours were cut at her last job due to COVID but that Alexander was very motivated to work and had found jobs in the past. Ms. Thompson recommended that M.C. begin transitioning to a trial–home placement with reunification services continuing.

At the conclusion of the matter, the trial court took the case under advisement. On December 2, the trial court entered a TPR order finding that it was in M.C.'s best interest to terminate Alexander's parental rights. The trial court further opined that the attorney ad

8

litem had proved by clear and convincing evidence the grounds for TPR outlined in the joint petition:

> The Court further finds by clear and convincing evidence that other factors or issues arose subsequent to the filing of the original petition that demonstrate the placement of [M.C.] in the custody of [Alexander] is contrary to [M.C.]'s health, safety, or welfare, and that despite the offer of appropriate family services, [Alexander] has manifested an incapacity or indifference to remedying those issues or factors or rehabilitate their circumstances that prevent the placement of [M.C.] in her custody. Finally, the Court finds by clear and convincing evidence that [M.C.] has been subjected to aggravated circumstances. Specifically, the Court finds by clear and convincing evidence that there is little likelihood that services to [Alexander] will result in successful reunification.

Alexander filed a timely notice of appeal on December 21.

## II. *Standard of Review*

We recently reiterated our standard of review in termination–of–parental–rights cases:

> Pursuant to Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2020), an order forever terminating parental rights shall be based on clear and convincing evidence of one or more grounds. Ark. Code Ann. § 9-27-341(b)(3)(B). Proof of only one statutory ground is sufficient to terminate parental rights. The circuit court must also find by clear and convincing evidence that termination is in the best interest of the child, including consideration of the likelihood that the child will be adopted if the termination petition is granted and the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A).

> On appeal, termination–of–parental–rights cases are reviewed de novo. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. We must also defer to the superior position of the circuit court to weigh the credibility of the witnesses. The circuit court is in a far superior position to observe the parties before it. Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental

9

rights will not be enforced to the detriment or destruction of the health and well-being of the child.

*Burks v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 309, at 3–4 (internal citations omitted).

III. *Discussion*

A. Statutory Grounds

An order terminating parental rights must be based on a finding that at least one statutory ground for TPR was proved. Ark. Code Ann. § 9-27-341(b)(3)(B). Here, the trial court's termination of Alexander's parental rights was based upon all three grounds pled in the termination petition: (1) the failure-to-remedy ground; (2) the subsequent-factors ground; and (3) the aggravated-circumstances ground. Proof of only one ground is all that is necessary for this court to affirm the TPR. *Boomhower v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 397, at 7, 587 S.W.3d 231, 235.

Alexander argues that at the time of the TPR hearing, there were no remaining issues that prevented reunification, and DHS failed to offer the necessary services to support TPR. Accordingly, she maintains that the evidence supporting all three grounds was insufficient and that it was erroneous for the trial court to terminate her parental rights.

She notes that all three grounds have in common that they allow a parent's rights to be terminated where the parent has failed to correct some deficiency or impediment that prevents the return of the child to the home. Alexander asserts that the TPR order made clear that the decision was based on the finding that Alexander failed to benefit from the services, and M.C. would be at risk of inadequate supervision if returned to her care. Alexander urges, however, that the evidence did not support a finding that she was unfit and posed such a risk that she could not care for M.C.

Because proof of only one ground is all that is necessary for this court to affirm the TPR, *see Boomhower, supra*, we turn our attention to the aggravated-circumstances ground—specifically, the finding that there is little likelihood that continued services would result in successful reunification. A finding on this ground must also be predicated on proof that it is not likely that the parent can correct the impediment that precluded the child from being returned to the parent. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)*.

The ad litem, as the petitioning party, bore the burden of proof and was required to prove the elements of the grounds pled within the petition. *See Martin v. Ark. Dep't of Hum. Servs.*, 2017 Ark. 115, at 10, 515 S.W.3d 599, 607. Alexander maintains that the ad litem failed to prove the appropriate-services element and that additional services would not result in reunification. Evidence was offered at the TPR hearing that DHS admitted that the case had not been handled in the appropriate manner and that Alexander did not receive required services. Alexander acknowledges that there were prior reasonable-efforts findings in this case with the last occurring at the June 29 hearing, but she maintains that the ad litem was required to prove DHS made meaningful efforts during the approximately four months between the last hearing and the TPR hearing. *See Jones-Lee v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 160, 316 S.W.3d 261, 272 (2009) (permitting review of the efforts offer in the time following the last reasonable-efforts finding but prior to TPR decision).

We disagree. The record before us indicates that DHS offered twenty months of the following services to achieve the goal of reunification: visitation (supervised and unsupervised); transportation; mental-health services; multiple parenting classes, including child-parent intense therapy/training; drug testing; and a psychological evaluation. Yet after

twenty months of M.C. being in foster care and Alexander receiving services, M.C. was unable to even have an unsupervised or overnight visit with Alexander.

Further, despite having been ordered to maintain stable housing and income, Alexander provided no proof of income at the TPR hearing. The trial court found that

> [Alexander] had completed all the services offered by [DHS]; however, [Alexander] had not benefitted from the services. [Alexander] continued to test positive for marijuana throughout the case. [Alexander] would deny drug use, or blame being around others as a reason she would test positive. [Alexander] had remedied many of the environmental issues that existed when the case opened, and she has an appropriate home for [M.C.]. [Alexander]'s issue is her inability to apply the skill she has learned in the services offered to her in over two and half years.

Partial or even full completion of the case plan is not determinative of the outcome of the termination proceeding. *Arnold v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 300, at 13, 578 S.W.3d 329, 337. What matters is whether completion of the case plan achieved the intended result of making the parent capable of caring for the child. *Id.* We hold that the evidence supports the trial court's finding that in the present case, it did not.

Despite Alexander's assertions that testimony from Mr. Wallace and Ms. Hibbs demonstrated that they have no safety concerns regarding her ability to care for M.C., they both testified that, although they did not see a safety issue, neither recommended that M.C. could go home the day of the TPR hearing. Moreover, neither (1) had contacted Alexander's therapist to determine whether she was taking her medication as prescribed; (2) had contacted RCA to determine whether Alexander complied with substance-abuse treatment; and (3) knew who Alexander's therapists were. Ms. Hibbs was not even aware that Alexander currently was on probation until the ad litem questioned her about it. There was no testimony about new services that could be offered that was different from the past

12

twenty months, merely testimony that DHS was trying to set up more visits that might occur in Alexander's home if that could be arranged.

The termination order stated:

> The Court is not convinced that additional services available would make an appreciable difference towards reunification. [Alexander] seems fully cognizant of the choices she makes, and she can provide rationalization for all of them. She minimizes problems instead of acknowledging them or looking for solutions. Therefore, the Court finds that there is little likelihood that further services would result in successful reunification with [Alexander].

Having reviewed the record before us, we hold that the trial court was not clearly erroneous in finding that clear and convincing evidence supports its finding that "there is little likelihood that services to the mother will result in successful reunification." Accordingly, the trial court's TPR finding based on the aggravated-circumstances ground is affirmed. Because only one statutory ground is necessary to be proved to support a TPR order, we need not discuss Alexander's statutory-grounds argument. *See Reyes-Ramos v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 46, at 12, 571 S.W.3d 32, 39.

### B. Best-Interest Analysis

Alexander next argues that the evidence failed to demonstrate that TPR was in M.C.'s best interest because the ad litem failed to sufficiently demonstrate that M.C. could achieve permanency through adoption and because Alexander did not pose a risk of harm.

In determining the best interest of the child, a trial court must take into consideration (1) the likelihood that the child will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child caused by returning the child to the custody of the parent. *Miller v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 280, at 14–15, 626 S.W.3d 136, 144. Adoptability and potential

13

harm are merely factors to be considered—they are not elements of the cause of action and need not be established by clear and convincing evidence. *Id.* at 15, 626 S.W.3d at 144. Rather, after considering all the factors, the trial court must find by clear and convincing evidence that termination of parental rights is in the best interest of the children. *Id.* In considering potential harm caused by returning the child to the parent, the trial court is not required to find that actual harm would result or affirmatively identify a potential harm. *Id.* Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of a stable, permanent home. *Id.*

The purpose of terminating a parent's parental rights to his or her child is to provide permanency in that child's life when return to the family home "cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective." Ark. Code Ann. § 9-27-341(a)(3). A court may order termination of parental rights if it finds there is an "appropriate permanency placement plan" for the child. Ark. Code Ann. § 9-27-341(b)(1)(A).

### 1. *Adoptability*

The question of a child's adoptability is but one factor that is to be considered when making a best-interest determination. *Robinson v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 208, at 4, 625 S.W.3d 388, 391. This court has further explained that there is no requirement that adoptability be established by clear and convincing evidence; rather, after consideration of all the factors, the evidence must be clear and convincing that TPR is in the best interest of the children. *Id.*

Alexander cites *Kerr v. Arkansas Department of Human Services*, 2016 Ark. App. 271, 493 S.W.3d 342, in which this court, while acknowledging that it does not require abundant

evidence of adoptability, nonetheless held that "[c]onsideration requires evidence . . . or at least some finding by the trial court that other aspects of the best-interest analysis so favor termination that the absence of proof on adoptability makes no legal difference." *Kerr*, 2016 Ark. App. 271, at 7, 493 S.W.3d at 346–47. We further noted that generally a caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Id*. at 7, 493 S.W.3d at 346. Ultimately, however, the trial court's best-interest finding was reversed because the finding that the children were adoptable was not supported by any evidence that demonstrated a likelihood of adoptability. *Id*. Alexander maintains that, just as in *Kerr*, DHS failed to offer sufficient evidence that permanency for M.C. could be achieved through an adoption.

Alexander urges that the testimony of the adoption specialist, Ms. Keith, did not present the full picture regarding M.C. and should not have been found to sufficiently support the adoptability prong or that there was an appropriate permanency plan for M.C. We disagree and hold that Alexander's reliance on *Kerr*, *supra*, for the premise that the trial court erred in finding M.C. adoptable is misplaced. In *Kerr*, the only testimony relating to adoptability was that of one of the children stating that "she wanted her mother's rights terminated and that she wanted her foster parents to adopt her." *Id*. at 8, 493 S.W.3d at 347. Additionally, the trial court made no finding that this absence of evidence of adoptability made "no legal difference" to the ultimate decision of what was in the children's best interest. *See id*.

Ms. Keith, who has worked as an adoption specialist for thirty-three years, testified that she saw no barrier to M.C.'s being adopted. When asked if she had run a data match for M.C., Ms. Keith replied that she had and found 194 families who would consider

children with similar characteristics. Alexander argues that because Ms. Keith could not enter the information that M.C. had been in seventeen different placements into her data match, it must be inaccurate. But Ms. Keith testified that she did enter the following into the data match: "aggressive behavior; destructive to furnishings and property; may or will require counseling; angry or throws temper tantrums; oppositional and defiant. And for the—oh and neglected and not legally free for adoption. And for the parent, I put use—drug and alcohol use." Additionally, at the time of the TPR hearing held on October 19, 2020, M.C. had been in the same therapeutic foster home since August 3, 2020, and even by Ms. Hibbs's testimony, M.C. was doing well.

> The trial court specifically found that
>
> [t]he appropriate plan is adoption. Ms. Keith testified that she is the adoption specialist assigned to this case. She provided detailed testimony about the matching lists she obtained for this child and his characteristics, which resulted in one hundred and ninety-four (194) matches. Although she testified that this child has had 17 foster home placements, she does not see any barriers to adoption. The Court has taken adoptability into consideration in making its findings today.

This court has said that "[a]doptability is merely a consideration and not a requirement." *Miller*, 2016 Ark. App. 239, at 10, 492 S.W.3d at 119. Even so, "[c]onsideration requires evidence . . . or at least some finding by the trial court that other aspects of the best-interest analysis so favor termination that the absence of proof on adoptability makes no legal difference." *Id*. Accordingly, with respect to adoptability, the trial court is required to demonstrate that it considered the evidence presented regarding the children's adoptability, or the court must make a finding that the children's adoptability makes no legal difference. *Solee v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 640, at 5, 535 S.W.3d 687, 691. For example, in *Brown v. Arkansas Department of Human Services*, 2015 Ark. App. 725, at 5, 478

16

S.W.3d 272, 276, we held that the trial court clearly erred in its findings where there was no evidence introduced at the TPR hearing regarding the adoptability of the child, and the trial court made no finding that the absence of evidence of adoptability made "no legal difference" to the ultimate decision of what was in the child's best interest.

Here, our review of the record reveals evidence regarding M.C.'s adoptability and indicates that the trial court considered this evidence as a factor in its decision regarding TPR. DHS was not required to prove adoptability by clear and convincing evidence. *See Solee*, 2017 Ark. App. 640, at 7, 535 S.W.3d at 692; *see also* Ark. Code Ann. § 9-27-341(b)(3). There is no requirement that an adoption specialist testify at the TPR hearing or that the process of permanent placement be completed at the time of the TPR hearing. *Solee*, 2017 Ark. App. 640, at 7, 535 S.W.3d at 692. Additionally, there is no requirement to prove this element by clear and convincing evidence or to identify an exact family that, upon TPR, would be willing to adopt M.C. *Id*. In this case we do have both the testimony of an adoption specialist and related findings by the trial court. The Juvenile Code does not require "magic words" or a "specific quantum" of evidence to support a trial court's finding regarding adoptability. *Id*. at 9, 535 S.W.3d at 693. It merely requires that if an adoptability finding is made, then evidence must exist to support it. *Id*. Evidence that adoptive parents have been found is not required and neither is evidence that proves the child will be adopted. *Id*.

### 2. *Risk of Harm*

In considering potential harm caused by returning the child to the parent, the trial court is not required to find that actual harm would result or affirmatively identify a potential harm. *Gulley v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 367, 498 S.W.3d 754. Potential

17

harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability the child receives in a permanent home. *Jackson v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 440, 503 S.W.3d 122. The risk for potential harm is one factor for the court to consider in its best-interest analysis. *Abdi v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 173, 544 S.W.3d 603. This court has consistently noted that continuing drug use demonstrates potential harm. *Jackson*, *supra*.

Moreover, credibility determinations are for the trial court to make, not this court. *Schaible v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 541, at 9–10, 444 S.W.3d 366, 372. It is well settled that a parent's past behavior is an indicator of likely potential harm should the child be returned to the parent's care and custody. *Gonzalez v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 425, 555 S.W.3d 915.

Alexander argues that the evidence also failed to demonstrate that she posed a risk of harm to M.C. For all the reasons argued concerning the grounds for TPR, Alexander asserts that those arguments demonstrate why the TPR decision was not in M.C.'s best interest. Alexander submits that she has demonstrated sufficient stability and that she is able to appropriately parent M.C. She notes that she is ready to work towards transitioning M.C. back home as recommended by Ms. Thompson.

Alexander contends that the real harm M.C. faced was remaining in foster care. She reiterates that Ms. Thompson noted that foster care and the multiple moves were negatively affecting M.C. and were causing him additional trauma. Alexander argues that this trauma should not be continued by ending his chance at maintaining his one constant caregiver— his mother.

We disagree and hold that the trial court did not clearly err in its potential-harm determination. "Further, evidence that supports a subsequent-factors finding also supports a potential-harm finding." *Johnson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 313, at 11, 603 S.W.3d 630, 636. The trial court, in its TPR order, stated:

> [M.C.] needs a safe, appropriate environment with a drug-free and non-violent parent who will ensure he receives appropriate care, supervision, and therapy. [Alexander] has not shown that she can provide such for [M.C.] now or any time in the future. M.C. has significant educational, and behavior needs that have been exacerbated by [Alexander]'s neglect. Testimony at the [TPR] hearing indicated that [Alexander] has very little insight or knowledge about the needs of [M.C.]. [Alexander] cannot safely parent [M.C.] even with Dr. John present and coaching her. She requires constant redirection to either pay attention to [M.C.] or to not physically and emotionally abuse [M.C.]. [Alexander]'s one attempt to progress beyond supervised visitation ended after one visit because [Alexander] was unwilling or unable to follow Court Orders in relation to her visits. Instead, [Alexander] chose to ignore Court Orders and do what she wanted. The Court finds that [Alexander] cannot meet the needs of [M.C.]. The Court finds that establishing a goal of placement with [Alexander], or continuing contact between [Alexander] and [M.C.] would result in harm to [M.C.] for the many reasons mentioned supra. This Court specifically finds that [M.C.'s] health and safety would be at risk if custody of him was ever returned to [Alexander].

Past actions of a parent over a meaningful period of time are good indicators of what the future may hold. *Guerrero v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 428, at 8. From June 2018 to February 2019, Alexander participated in safe-care parenting classes, drug-and-alcohol assessments, and home visits. Less than a month after these interventions, DHS was contacted by the North Little Rock Police because M.C., a then two-year-old child, was wandering in the street with no supervision.

Then after twenty months of services including random drug screens, drug-and-alcohol assessments, substance-abuse treatment, counseling, intensive parent-child counseling, multiple parenting classes, and psychological evaluations, Alexander is still unable to even have unsupervised visitation with M.C. In light of the evidence of

Alexander's past behavior, we hold that the trial court did not clearly err in finding that additional services will not result in reunification with M.C. The record before us indicates that the evidence supports the trial court's potential-harm finding that returning M.C. to Alexander's custody would likely expose him to illegal substances, inappropriate caretakers, inadequate supervision, and neglect. Accordingly, we affirm.

Affirmed.

MURPHY and BROWN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Dana McClain*, attorney ad litem for minor child