Cite as 2021 Ark. App. 476

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-21-286

|  |  |
|---|---|
| SARAH CARR AND BENJAMIN NOBLE<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **Opinion Delivered** December 1, 2021<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT<br>[NO. 66FJV-18-291]<br><br>HONORABLE LEIGH ZUERKER, JUDGE<br><br>AFFIRMED |

## LARRY D. VAUGHT, Judge

Sarah Carr and Benjamin Noble appeal the order entered by the Sebastian County Circuit Court terminating their parental rights to ZN (born December 7, 2017). On appeal, Carr and Noble argue that the circuit court clearly erred in finding that grounds supported its termination decision. We affirm.

On July 20, 2018, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect alleging that it had removed ZN from the custody of Carr (his mother) and Noble (his father) on July 17. The petition alleged that ZN was at substantial risk of serious harm as a result of abandonment, abuse, neglect, sexual abuse, sexual exploitation, or parental unfitness. Attached to the petition was a seven-page affidavit of Karen Pearson, a DHS caseworker, in which she summarized the events giving rise to ZN's removal from his parents' custody. Pearson explains that DHS had opened a protective-

services case on the family on April 30, 2018, after police and representatives of DHS responded to a report that a baby, ZN, had been left in a baby swing unattended outside by a dumpster. The baby's parents, Carr and Noble, were found nearby inside their apartment. Carr and Noble tested positive for THC, and they did not seem to understand the severity of the situation. Pearson further asserted in her affidavit that the DHS representative at the scene observed the home to be excessively cluttered with trash, clothes, and dirty dishes, and she noticed a strong animal odor. Pearson's affidavit goes on to detail the three-month history of the protective-services case that included Intensive Family Services (IFS)—eight-week in-home parenting therapy. At the conclusion of this therapy, IFS reported to DHS that Carr and Noble had failed to make the changes necessary to provide a safe living environment for ZN. As such, DHS removed ZN from the custody of Carr and Noble on July 17.

An ex parte order of custody was entered on July 20, and the circuit court entered an adjudication order on September 25, finding that ZN was dependent-neglected due to parental unfitness. The court ordered the parents to obtain and maintain stable housing, income, and transportation; complete parenting classes and a psychological evaluation; complete a drug-and-alcohol assessment and to submit to drug screens; and visit ZN regularly. Noble was ordered to complete anger-management classes and obtain a driver's license. The goal of the case was reunification.

After a review hearing, the circuit court entered an order on February 6, 2019, finding that ZN should remain in the custody of DHS. The court also found that Carr and Noble had maintained housing, Carr had income through Social Security and disability benefits, Noble had no income, and the parents had no transportation. Both parents were ordered to complete

couples counseling and a drug-and-alcohol assessment, Noble was again ordered to obtain a driver's license, and both parents were directed to visit ZN regularly. The court found that DHS had made reasonable efforts to provide reunification services, and reunification continued to be the goal of the case.

A permanency-planning order was entered by the circuit court on July 16. The court found that ZN should remain in DHS custody and that the goal remained reunification. The court also found that the parents had partially complied with the case plan in that Carr was receiving disability income, Noble had started a new job and had completed anger-management counseling, the parents had completed a psychological evaluation, and they had tested negative on drug screens. The court noted that the parents lacked adequate transportation for ZN (they were using public transportation or a moped). The court also found that DHS had made reasonable efforts to provide reunification services.

In review orders entered on November 21, 2019; and January 10 and March 24, 2020, the circuit court found that Carr and Noble were in compliance with the case plan, DHS had made reasonable efforts, and the goal was reunification. The court also approved a transition plan regarding visitation that could lead to a trial home placement.

A second permanency-planning order was entered on July 21 in which the circuit court approved the trial home placement that had begun on June 19. The court found that the goal of the case was reunification, the parents were complying with the case plan, and DHS had made reasonable efforts. However, following a September review hearing (that was not completed), a September 29 review order was entered that limited Carr and Noble to four-hour-a-week supervised visitation.

On October 29, DHS moved to suspend Carr's and Noble's visitation. DHS alleged that it had ended the trial home placement on September 4 and that the circuit court had ordered supervised visitation. DHS further alleged that it was concerned about the impact of the visits on ZN due to reports it had received from ZN's day care, his foster mother, and a DHS program assistant. On November 4, the circuit court entered an order temporarily suspending Carr's and Noble's visitation.

On November 16, the circuit court resumed the September review hearing, and in its December 15 review order, the court changed the goal of the case to adoption following termination of parental rights. While the court found DHS had made reasonable efforts and that Carr and Noble had partially complied with the case plan, the court also found that they had not appropriately maintained the cleanliness of the home; their transportation is a moped, which is not appropriate for a child; Noble had not obtained his driver's license; he left in-home IFS sessions; and Carr fell asleep during the sessions.

On January 6, 2021, DHS petitioned to terminate Carr's and Noble's parental rights to ZN. DHS alleged that the subsequent-factors and aggravated-circumstances grounds supported termination and that termination was in the best interest of ZN. Termination hearings were held on March 4 and 12.

Kaitlyn Gardner, an IFS therapist, testified at the hearing that she provided almost six-weeks of in-home intensive parenting therapy for Carr and Noble during ZN's trial home placement. She said that she was in the Carr and Noble home three to four days a week. The goals were for Carr and Noble to learn to how to communicate more effectively, to interact better with ZN and create an attachment with him, and to learn safe parenting skills. Gardner

4

testified that following the therapy, she still had concerns about ZN's physical safety in the home and his parents' interaction with him.

For example, one of Gardner's reports states that the home smelled of urine, was dirty, and had flies and other bugs flying around. She testified that she saw pill bottles, dirty diapers and wipes, tools lying around, and fireworks and a pocketknife on an entry table. She noted that a plate of spaghetti had been on the floor for days. She testified that once ZN pulled an insert out of a shoe and started to eat it. Her report states that he took a bite of it and swallowed it while Carr watched and did not intervene. Gardner's report documented an incident when she reminded Noble that ZN's speech therapist recommended that ZN not use a pacifier and that they had worked on techniques to slowly remove it from ZN. In response, Noble ripped the pacifier out of ZN's mouth. When ZN started screaming, Gardner said Noble did not try to soothe or redirect ZN but instead stated hatefully, "They made me do it." Gardner stated that ZN did not look to his parents for safety and security. Gardner testified that ZN's interactions with, and attachment to, his parents were worse at the end of the trial home placement: ZN screamed, he acted like he was being kidnapped by his parents, he stiffened up around Noble, and he head butted Noble. Gardner stated that she "never saw [Carr and Noble] demonstrate anything that I modeled for them," there was no progress in the IFS therapy that she provided, and Carr and Noble insisted they did not need help with their parenting skills.

Laura Beth Smith, ZN's occupational therapist, testified that she had been treating ZN since April 2020. She said that in the summer of 2020, ZN had some behavioral issues and that he required much more redirection than usual. She also stated that during that same

summer, ZN came to therapy in his pajamas, his hair was disheveled, and he had bug bites on him.

Sarah Gibbons, ZN's outpatient therapist, testified that she started treating ZN in October 2020 after the trial home placement. Gibbons stated that when he arrived, he struggled with behavioral and sleep issues. According to Gibbons, she had seen "significant improvement" in ZN since October 2020.

Renee Marr, the director of ZN's day care, testified that during the summer of 2020, she observed that ZN was dirty, he had an odor, and he sometimes had fecal matter on his bottom. She also noticed ZN was having behavioral issues at the end of the summer: he cried a lot, he screamed loudly, he was angry, he was uncooperative, he had meltdowns, he spit, he tried to slap teachers and classmates, and he was biting. Marr testified that this was unusual behavior for ZN. Marr testified that ZN was currently doing well in the day care and that his behavior had greatly improved.

ZN's foster mother, Megan Haulsey, testified that ZN had been in her care for about two and a half years. Haulsey testified that ZN was an independent, active, and engaged little boy when he started the trial home placement with Carr and Noble. But when the trial home placement ended, Haulsey said that he was different, sad, angry, frustrated, and clingy, and he would not leave her or her husband. She said that he spat at her once, bit himself, threw things, and screamed.

Cassidy Pickle, a DHS caseworker, testified that she took over the case in August 2020 during ZN's trial home placement. She stated that her first home visit was in early September 2020 and that the home was very dirty and had a very strong odor. She said ZN threw a plate

of spaghetti on the floor, and Carr made no move to clean it. Gardner saw a box cutter and fireworks on a table and a pill bottle between the couch cushions.

The next day, Pickle had a meeting with her supervisor, the supervisor for the caseworker before her, and an IFS therapist. They told Gardner more about Carr and Noble's unclean home and about how ZN was unclean, smelled, and had bug bites on his body. She further stated that this was the family's second round of IFS, and IFS was not requesting an extension of services because they were not making progress.

Pickle testified that she made a second visit to the home of Carr and Noble in January 2021. She asked Noble if he had gotten his driver's license as ordered by the court, and he told her he was not going to get it. He said his moped "works just fine." When Pickle asked Noble where Carr was, he said Carr was still in bed. Pickle said she overheard Carr say she did not want to speak to Pickle or the court-appointed special advocate with Pickle, and she was not coming out of the bedroom.

When asked if there were additional services to offer Carr and Noble, Pickle responded, "[W]e've exhausted all the options to give them an adequate chance to learn the parenting skills." Pickle also noted that Noble showed a lot of animosity toward DHS and that he and Carr stated that they did not feel they needed any parenting help. Pickle testified that it was DHS's recommendation that Carr's and Noble's parental rights to ZN be terminated:

> [T]his case has been open nearly three years at this point. They've been referred for every service that . . . we could offer to help them to get to the point that they can adequately take care of [ZN] as he needs to be. They have not really implemented those services . . . . IFS in-home service . . . was given . . . on how to adequately care for [ZN] and that it just hasn't been implemented. They haven't done those things, and [ZN] at this point, he needs permanency. He's been in care practically his entire life . . . .

Pickle did not believe more time would be of any benefit in this case.

Karmella Montgomery was called by Carr and testified that she provided individual counseling to Carr and couples counseling to Carr and Noble from June 2019 to March 2020. According to Montgomery, during that time frame, Carr and Noble were working steadily toward their treatment goals, and she (Montgomery) did not have any concerns about their parenting skills. Montgomery stated that in December 2019, she observed Carr and Noble having a nice, normal visit with ZN. Montgomery stated that the last time she saw Carr and Noble with ZN was in February 2020. She also stated that she was not involved in the trial home placement or its termination.

Noble testified that he and Carr had lived in their apartment for over a year, he was working, and he and Carr were in a committed relationship. He said that he has completed all services requested of him. He testified that he uses a moped for transportation but that he would take the bus or a taxi if he needed to transport ZN. He admitted that he had not gotten his driver's license despite being ordered to do so nearly two years earlier because he did not have the time: "I've been busy with things at home and in trying to keep things together at home." He added that he actually preferred the moped because it is "good on gas" and gets him where he needs to go.

Noble talked about the pacifier incident. He admitted that he pulled the pacifier out of ZN's mouth out of frustration and told ZN, "I'm sorry [ZN], it's not my fault. They made me do it." At one point during his testimony Noble claimed that DHS had not provided him any parenting training, but in another, he admitted that his IFS therapist gave them a list of parenting skills to practice with ZN. He said that he has been bothered in this case by the fact that the judge commented on how well he and Carr were doing, and then the next week ZN

8

was "pulled out of our house," and the trial home placement was terminated. He believed the change in the caseworker played a role in the termination of the trial home placement and that he had been "sabotaged" by IFS.

Carr testified that she has complied with the DHS case plan. She said she has stable housing and income: she and Noble have lived in their apartment for a year, and she draws $814 a month in disability payments. She said that she attended parenting classes, participated in all the evaluations that were required, and visited regularly with ZN. She testified that ZN could be safely returned to her.

Carr testified that ZN was bathed every night and that he and his clothing were clean when he went to day care. She said that witnesses who testified differently were lying. Carr also disputed earlier testimony about the spaghetti and shoe-insert incidents. Carr stated that she cleaned the spaghetti up right after ZN threw it on the floor and that she took the shoe insert from ZN before he placed it in his mouth. Carr testified that Gardner was not helpful and did not offer tips and advice on parenting skills. Carr said that she thought Gardner was there to break up the family. She also testified that she was excluded from information and meetings with ZN's therapists that would have benefited her had she been included. But she also said that she did not trust the caseworkers and that, despite access to multiple DHS representatives and referrals, "I don't really like to ask anybody for help because I -- me being a mother, I figured I could figure it out on my own before I asked for help."

At the conclusion of the hearings, the circuit court ruled from the bench, terminating Carr's and Noble's rights to ZN. The court found that DHS had met its burden of proving

9

both grounds alleged and further found that termination was in the best interest of ZN. The court memorialized its findings in an April 13 order. This appeal follows.

Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Dowdy v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 180, at 10, 314 S.W.3d 722, 727. Pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(A)(i) and (ii) (Supp. 2021), an order terminating parental rights must be based on a finding that termination is in the child's best interest, which includes consideration of the likelihood that the child will be adopted and the potential harm caused by returning custody of the child to the parents. In addition, the proof must establish at least one of several statutory grounds. Ark. Code Ann. § 9-27-341(b)(3)(B). The facts warranting termination of parental rights must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3).

When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the circuit court's finding is clearly erroneous. *Dowdy*, 2009 Ark. App. 180, at 11, 314 S.W.3d at 728. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*, 314 S.W.3d at 728. We give a high degree of deference to the circuit court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Id.*, 314 S.W.3d at 728.

Carr and Noble both argue on appeal that the circuit court clearly erred in finding that the subsequent-factors and aggravated-circumstances grounds support its termination

10

decision.[1] Proof of only one ground is all that is necessary for this court to affirm the order terminating parental rights. *Alexander v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 345, at 11, 634 S.W.3d 807, 815–16. We first address the aggravated-circumstances ground—specifically, the finding that there is little likelihood that services to the family will result in successful reunification.

We hold that the circuit court did not clearly err in finding that there is little likelihood that services to the family will result in a successful reunification. At the time of the termination hearing, ZN was just over three years old and had been out of his parents' custody for over thirty-one months. During that time, Carr and Noble had completed many DHS services, including in-home intensive parenting therapy, yet the evidence is extensive that Carr and Noble have shown no progress.

Gardner, who was in the family's home during the trial home placement three to four days a week for nearly six weeks, testified that despite all the training the parents had received, they had not learned to safely care for ZN. Gardner testified that she saw dangers around the home such as pill bottles, a box cutter, old food, fireworks, and dirty diapers. Gardner stated that the home smelled of urine and had flies and other bugs flying around. She said that there was little or inappropriate interaction between ZN and his parents. For example, she talked about the instances when ZN threw spaghetti on the floor and when he took a bite of and swallowed part of a shoe insert, and Carr did nothing about it. Gardner also spoke about the instance when Noble yanked ZN's pacifier from him and yelled, "They made me do it."

---

[1]Carr and Noble do not challenge the court's best-interest finding.

Gardner testified that ZN did not look to his parents for safety and security and that his interactions with, and attachment to, his parents were worse at the end of the trial home placement. She said that ZN screamed, he acted like he was being kidnapped by his parents, and he stiffened up around and head butted Noble. Gardner testified that Carr and Noble were not receptive to her instructions or to services regarding communication between the two of them, she "never saw [Carr and Noble] demonstrate anything that I modeled for them," there was no progress in the IFS she provided, and Carr and Noble insisted they did not need any assistance in their parenting skills. Gardner's report states that IFS did not request an extension of services because the parents were not making any progress.

There was also evidence from ZN's day-care director, Marr, who testified about her concerns about ZN during the trial home placement. Marr said that during that time, ZN was dirty, he smelled, he had dried fecal matter on his bottom, and was not a happy child. ZN's occupational therapist testified that ZN came to therapy in pajamas, his hair was a mess, and he had bug bites. ZN's outpatient therapist, Gibbons, testified that after the trial home placement, ZN struggled with behavioral and sleep issues. Haulsey, ZN's foster mother, testified that ZN was doing well before the trial home placement, but after the trial home placement, he was a different, sad, angry, frustrated, clingy, and aggressive boy.

Pickle, the DHS caseworker, testified that during the trial home placement she observed that the home was very dirty and had a very strong odor. She saw food on the ground, a box cutter and fireworks on a table, and a pill bottle between the couch cushions. Pickle testified that the family had two rounds of IFS therapy and that both were

12

unsuccessful.[2] Pickle testified that, despite being ordered by the court (since September 2018) to obtain his driver's license, Noble told her he was not going to get it—telling her he believed his moped "works just fine." She said that there are no further services to offer Carr and Pickle. She also stated that Noble showed a lot of animosity toward DHS and that he and Carr stated that they did not feel they needed any parenting help, which was something Carr and Noble admitted during the hearing.

In sum, while Carr and Noble completed the services provided to them during this nearly three-year-long case, there is significant evidence that either they did not learn the skills necessary to safely care for ZN or they believe they do not need help parenting ZN. If Carr and Noble are interested in more services to improve their parenting skills, the evidence presented in this case is that there are no additional services to offer Carr and Noble.

In this appeal, Carr contends that she benefited from the services provided, that her parenting skills improved, and that she was absolutely capable of caring for ZN. She maintains that the trial home placement failed because DHS failed to provide her the appropriate tools, information, and communication. Noble argues that ZN's bad behavior was caused by the termination of the trial placement. He further argues that his yanking a pacifier from ZN, his failing to get a driver's license, the condition of his home, and his belief that DHS worked against him are not bases on which to support the conclusion that there is little likelihood that services to the family will result in successful reunification.

---

[2]The first round of IFS occurred in 2018 during the protective-services case, lasted eight weeks, was unsuccessful, and led to this dependency-neglect case.

Carr's and Noble's arguments ask us to reweigh the evidence supporting the circuit court's aggravated-circumstances finding, which we cannot do. It is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court. *Blasingame v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 71, at 6, 542 S.W.3d 873, 877. In the case at bar, the circuit court stated that it "greatly considered" the testimony of the therapists who testified. We cannot reweigh that finding.

Having considered this record and deferring to the circuit court's credibility determinations, we hold that the court did not clearly err in finding that there was little likelihood that services would result in successful reunification. As stated above, only one ground is necessary to terminate parental rights. *Dowdy*, 2009 Ark. App. 180, at 15, 314 S.W.3d at 729. Therefore, we need not discuss the alternative ground found by the circuit court as supporting termination. *Id.*, 314 S.W.3d at 729.

Affirmed.

VIRDEN and GLADWIN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for separate appellant Sarah Carr.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for separate appellant Benjamin Noble.

*Andrew Firth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.